**UNITED STATES of America, Plaintiff,**

v.

**9/1 KG CONTAINERS, More or Less of an ARTICLE OF DRUG FOR VETERINARY USE, et al., Defendants.**

No. 86–3201.

United States District Court,
C.D. Illinois,
Springfield Division.

Dec. 8, 1987.

James A. Lewis, Asst. U.S. Atty., Springfield, Ill., for U.S.

John Ess, Heyl, Royster, Voelker & Allen, Springfield, Ill., for amicus curiae American Veterinary Medical Assoc.

Philip C. Olsson, David P. Weeda, Arthur Y. Tsien, Olsson, Frank and Weeda, P.C., Washington, D.C., for amicus curiae American Feed Industry Assn.

James R. Phelps, Robert A. Dormer, Hyman, Phelps & McNamara, P.C., Washington, D.C., William F. Trapp, Springfield, Ill., for defendants.

LeFevre, Zeman, Oldfield & Schwarm, Vandalia, Ill., for American Food Animal Veterinary Medical Assn.

## OPINION

MILLS, District Judge:

In this cause, the Government seeks the condemnation of bulk animal drugs pursuant to 21 U.S.C. § 334.[1] As this is a case of first impression, we proceed with very little in the way of case law to guide us.

The Government alleges that the drugs do not have adequate directions for use and are, therefore, misbranded. Additionally, the Government claims that five of the lots are subject to condemnation because they have not been approved by the Food & Drug Administration (FDA). The claimant, Schuyler Laboratories (Schuyler), argues that the seized articles of drug are exempt from the labeling requirements of the Food, Drug, and Cosmetic Act (Act).

The parties have filed cross-motions for summary judgment pursuant to Fed.R. Civ.P. 56. Rule 56 authorizes summary judgment where no genuine issue as to any material fact exists, and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

This is such a case.

Summary judgment for claimant.

### I. Facts

The facts are undisputed. The complaint, filed July 3, 1986, alleges that the Defendant drugs are misbranded under the provisions of 21 U.S.C. § 352(f)(1),[2] in that their labels do not bear "adequate directions for use."[3] The complaint further alleges that certain of the drugs are unapproved new animal drugs within the meaning of 21 U.S.C. § 321(w)(3),[4] and, therefore, are adulterated under 21 U.S.C. §§ 360b(a)(1)[5] and 351(a)(5).[6]

On July 9, 1986, the United States Marshal seized approximately 52 lots of drugs at the Schuyler facility in Rushville, Illinois. Schuyler filed a claim for the drugs on July 18, 1986.

Schuyler purchases bulk drugs (active drug ingredients that require further processing before use) for repacking and sale directly and exclusively to veterinarians. Some of the seized articles were in the original containers in which the drugs were shipped to Schuyler. The labeling of these products bears shipping information, such as the name and place of business of the

1. The section states in pertinent part:
   Any article of ... drug ... that is adulterated or misbranded when introduced into or while in interstate commerce or while held for sale (whether or not the first sale) after shipment in interstate commerce, or which may not, under the provisions of sections 344 or 355 of this title, be introduced into interstate commerce, shall be liable to be proceeded against while in interstate commerce, or at any time thereafter, on libel of information and condemned in any district court of the United States ... within the jurisdiction of which the article is found....
   21 U.S.C. § 334(a)(1). All section references herein are to sections of the Act as found in the U.S. Code.

2. The section provides in pertinent part: "A drug or device shall be deemed to be misbranded ... [u]nless its labeling bears (1) adequate directions for use...." See endnote 3 for definition of "adequate directions for use."

3. 21 C.F.R. § 201.5 defines "adequate directions for use" as "directions under which a layman can use a drug safely and for the purposes for which it is intended."

4. The section states in pertinent part:

The term "new animal drug" means any drug intended for use for animals other than man, including any drug intended for use in animal feed but not including such animal feed ... which drug is composed wholly or partly of any kind of penicillin, streptomycin, chlortetracycline, chloramphenicol, or bacitracin, or any derivative thereof, except when there is in effect a published order of the Secretary declaring such drug not to be a new animal drug....
21 U.S.C. § 321(w)(3).

5. The section states in pertinent part:
   A new animal drug shall, with respect to any particular use or intended use of such drug, be deemed unsafe for the purposes of section 351(a)(5) and section 342(a)(2)(D) of this title unless—
   (a) there is in effect an approval of an application filed pursuant to subsection (b) of this section with respect to such use or intended use of such drug....
   21 U.S.C. § 360b(a)(1).

6. "A drug or device shall be deemed to be adulterated ... if it is a new animal drug which is unsafe within the meaning of section 360b of this title...." 21 U.S.C. § 351(a)(5).

manufacturer, packer, or distributer, and the identity of the bulk drug substance. The remaining articles seized had been repacked by Schuyler and bear labels that contain the name "Schuyler Laboratories" and state "for manufacturing, processing, or repacking," and contain the name of the drug. The seized articles are not accompanied by labeling that bears directions for use.

## II. Analysis

### A. Labeling under § 352(f)(1)

Under 21 U.S.C. § 352(f)(1),

[a] drug or device shall be deemed to be misbranded— ... Unless its labeling bears (1) adequate directions for use; ... *Provided,* That where any requirement of clause (1) of this subsection, as applied to any drug or device, is not necessary for the protection of the public health, the Secretary *shall* promulgate regulations exempting such drug or device from such requirement. (emphasis supplied)

In response to the *mandatory* proviso of the above quoted section, the Secretary promulgated the following exemption for bulk drugs:

A drug in a bulk package, except tablets, capsules, or other dosage unit forms, intended for processing, repacking, or use in the manufacture of another drug shall be exempt from § 502(f)(1) [21 U.S.C. § 352(f)(1)] of the Act if its label bears the statement "Caution: For manufacturing, processing, or repacking".... But the exemption shall not apply to a substance intended for a use in manufacture, processing, or repacking which causes the finished article to be a new drug....

21 C.F.R. § 201.122 (1987).

It is the Government's contention that the limitation on the exemption ("But the exemption shall not apply ...") works to take these bulk drugs out of the exemption because the finished articles form new animal drugs. On the other hand, Schuyler contends that the bulk drugs are exempt and the limitation on the exemption does not come into play because the compounded drugs are not new animal drugs.

### 1. *The Burden of Proof*

The burden of proof falls on the Government to show by a preponderance of the evidence that: (1) the seized drugs are intended for use in animals; (2) that they do not bear adequate directions for use; and (3) that the drugs were held for sale after shipment in interstate commerce. *See United States v. An Article of Device: "Toftness Radiation Detector,"* 731 F.2d 1253, 1261 (7th Cir.), *cert. denied,* 469 U.S. 882, 105 S.Ct. 249, 83 L.Ed.2d 186 (1984). Since these facts have been admitted by claimant, the Government has carried its burden. Thus, the seized drugs are misbranded unless they fall within one of the exemptions from the requirement. Claimants contend that the drugs fall within the bulk drug exemption of 21 C.F.R. § 201.122 (quoted above).

There is a disagreement among the parties as to whose burden it is to show the applicability or nonapplicability of the exemption. To resolve this issue we are guided by *Toftness,* wherein the Court of Appeals, addressing the misbranding of a prescription device under § 352(f)(1), determined that one claiming an exemption under the misbranding regulations bears the burden of showing its applicability. The Court came to this conclusion after analysis of the statute's structure and application of the general rule that a party claiming entitlement to a statutory exemption bears the burden of proving the entitlement. *See United States v. First City Nat'l Bank,* 386 U.S. 361, 366, 87 S.Ct. 1088, 1092, 18 L.Ed.2d 151 (1967). The *Toftness* court stated:

[T]he FDA promulgated the regulations ... and those regulations make prescription devices one of several exemptions to the more general labeling requirements. No purpose justifying this odd structure occurs to us other than the purpose of shifting the burden of proof. By treating the large category of prescription devices under an exemption to the more general requirements, the FDA appears to have wanted to make its task somewhat easier by placing on claimants the

burden of proving that their device is safe and is actually effective for its intended purposes.

Although this regulatory arrangement may seem strange insofar as it makes prescription devices presumptively misbranded, the [regulatory scheme] is not contrary to either the letter or intent of the statute.

*Toftness,* 731 F.2d at 1261.

Thus, according to *Toftness,* unless the exemption is contrary to either the letter or intent of the statute, Schuyler must bear the burden of showing the applicability of the exemption.

### 2. *Applicability of the Bulk Drug Regulation*

It is axiomatic that for regulations to be valid they "must be consistent with the statute under which they are promulgated." *United States v. Larionoff,* 431 U.S. 864, 873, 97 S.Ct. 2150, 2156, 53 L.Ed. 2d 48 (1977). In *Manhattan General Equip. Co. v. Commissioner,* 297 U.S. 129, 56 S.Ct. 397, 80 L.Ed. 528 (1936), the Court stated: "The power of an administrative officer or board to administer a federal statute and to prescribe rules and regulations to that end is ... [only] the power to adopt regulations to carry into effect the will of Congress as expressed by statute. A regulation which does not do this, but operates to create a rule out of harmony with the statute, is a mere nullity." *Id.* at 134, 56 S.Ct. at 400, *quoted in Larionoff,* 431 U.S. at 873 n. 12, 97 S.Ct. at 2156 n. 12.

In the instant case, the regulation states that bulk drugs such as those at issue here are exempt from the § 352(f)(1) labeling requirements *unless* the bulk drug's use will result in a finished product which is a "new drug." However, under the regulation this "new drug" limitation can be avoided if an approved new drug application or new animal drug application covers the production and delivery of the drug substance to the application holder—in this case, the veterinarian.

Thus, the question for this Court is whether the bulk drug exemption regulation is in harmony with the letter and intent of the statute under which the regula-

tion was enacted. For the reasons given below, the Court finds that the regulation is not in harmony with the legislation.

### a. *The Legislative Scheme Generally*

■ Generally, Congress has shown a reluctance to interfere with the healing arts, of which veterinary medicine is obviously one. Specifically, the legislative history of the Food, Drug, and Cosmetic Act does not support the authority of FDA to meddle in the field of drug compounding done within the scope of the professional practice of medicine—be it veterinary or otherwise.

When the Act became law in 1938, it was clear to the legislators that it was not the purpose of the Act to involve the agency in the practice of the healing arts. The committee reports made clear that the bill was "not intended as a medical practices act and [would] not interfere with the practice of the healing art[s]...." S.Rep. No. 361, 74th Cong., 1st Sess. 3 (1935), *quoted in Chaney v. Heckler,* 718 F.2d 1174, 1179 n. 13 (D.C.Cir.1983), *rev'd on other grounds,* 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985). The *Chaney* court further stated that "the legislative history makes clear that Congress did not want to limit a physician's ability to treat his patients." *Chaney,* 718 F.2d at 1179 n. 13. As a former chief counsel to the FDA has stated:

The legislative history of the ... Act of 1938 is replete with statements that the statute was not intended to regulate the practice of medicine. The man who guided the legislation through the Congress, Senator Royal Copeland, was a physician, and was undoubtedly concerned about interfering with his profession.... Through the six years of legislative history the proposed legislation contained the affirmative requirement that every drug must bear adequate directions for use. Not only does the legislative history fail to show a Congressional intent that this be used to restrict the conditions for which physicians might prescribe drugs, but it flatly contradicts any such interpretation. In enacting the 1938 Act Congress clearly intended to

avoid impinging on the practice of medicine.

*Hutt, Regulation of the Practice of Medicine Under the Pure Food & Drug Laws,* 33 A. of Food & Drug Officials Q. Bull. 3, 7 & 9 (1969).

In 1962, the Drug Amendments Act, Pub. L. No. 87–781, 76 Stat. 781 (1962), greatly enhanced the FDA's regulation responsibilities. However, some explicit exclusions from that expanded authority uphold the original intent of the Act—that Congress nor the FDA should involve itself in the practice of the healing arts. For example, 21 U.S.C. § 374(a)(2) gave the FDA vast inspection powers with respect to prescription drugs. However, § 374(a)(2)(B) specifically exempted licensed practitioners who prescribe or administer drugs within the scope of their profession. Further, in § 360(a)(1) & (b), Congress defined "manufacture, preparation, propagation, compounding, or processing" for purposes of requiring the registration with the FDA of persons engaging in such activities. Yet, Congress specifically exempted from such registration licensed practitioners who "prescribe or administer drugs ... and who manufacture, prepare, propagate, compound, or process drugs ... solely for use in the course of their professional practice." 21 U.S.C. § 360(g)(2). This exemption is of particular interest as we are now concerned with the compounding of drugs by persons professionally licensed to do so. It seems peculiar that Congress would see fit to sanction such an exemption on the one hand, and on the other, permit the FDA to regulate labeling in the way it attempts to here. It makes no sense for Congress to grant this exemption, under § 360(a)(1), if it then takes away the very drugs that would be compounded.

Throughout the Act's history, Congress has shown a consistent pattern of staying out of the regulation of the healing arts. The extent to which the FDA attempts to involve itself in the healing arts here is clearly inconsistent and out of harmony with the statute's intent as manifested by Congress.

### b. *Unreasonableness of the Burden of Proof*

The second reason the Court finds the regulation not to be in harmony with the statute is that it shifts to the claimant an unreasonable burden to show that the exemption applies. Under the Government's regulatory scheme, for the exemption to apply, the claimant must show one of two things: (1) that the finished product in which the bulk drug is used is not a new drug; or (2) that if it is a new drug, a new animal drug application has been secured.

In the previously discussed case of *Toftness,* the Seventh Circuit expressly sanctioned the structuring of a regulation to shift the burden of an exemption's application to the claimant in a misbranding action. However, one of the grounds upon which the Court based its decision was the fact that the claimant was in a better position to come forward with the evidence which could show applicability of the exemption. In other words, claimant there was in a better position to show that the prescription device worked safely and effectively.[7]

Here, that is not the case. In fact, not only can the claimant not come forward with such evidence, but neither can the Government. Because of the nature of bulk drugs (drugs compounded with other drugs and substances to make a finished product), it is impossible to tell, at this stage, whether the finished product will be a new drug since there is no finished product yet. Thus, the FDA would force the claimant to produce proof which is nonexistent in order to invoke the exemption. This result is unreasonable.

Equally unreasonable is the claimant's option, under the exemption regulation, of showing that if a new drug is being produc-

---

7. The Court stated as its holding on the issue: Because the [claimants] are claiming the application of an exemption to the general labeling requirements, and because they appear to be in the better position to come forward with evidence that the [device] works safely and effectively, we conclude that ... claimants had the burden of proving that the prescription device exemption applied.... *Toftness,* 731 F.2d at 1262.

ed that a new animal drug application has been secured. Because the claimant has no idea what drug will be produced, he is in no position to secure an application. Second, the expectation that veterinarians should secure a new animal drug application ignores the practical realities of veterinary medicine. To expect an individual veterinarian to subject himself to the many years and millions of dollars involved in the approval process is clearly unrealistic and unreasonable. The veterinarian prescribes and compounds drugs as the need arises in the animals under his care. Such individual use of various drugs does not warrant the filing for a new animal drug application. In fact, the director of the FDA's Center for Veterinary Medicine, Dr. Gerald Guest, testified at a deposition[8] that he was unaware of any veterinarian who has ever obtained a new animal drug approval for a drug to be used in his practice.

In *Ruley v. Nevada Bd. of Prison Comm'rs,* 628 F.Supp. 108 (D.Nev.1986), the Court correctly stated:

> An administrative agency that administers a statute does not have the power to make law; rather, its authority is to adopt regulations to carry into effect the will of the legislature as expressed by the statute. *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 213–14, 96 S.Ct. 1375, 1390–91, 47 L.Ed.2d 668 (1976). It follows that the agency may not make a rule or regulation that is out of harmony with or goes beyond the scope of its statutory grant of authority.

*Ruley,* 628 F.2d at 111; *see also United States v. Richards,* 583 F.2d 491, 495 (10th Cir.1978) ("the validity of regulations promulgated under an authorizing statute will be sustained [only if] they are 'reasonably related to the purposes of the enabling legislation.'"); *Bates v. United States,* 581 F.2d 575, 580 (6th Cir.1978).

Clearly, for the reasons given above, the regulation at issue is "out of harmony" with the statutory authority and "goes beyond the scope" of it. Congress has, throughout the history of the Act, shown great deference to the autonomy of the healing arts and has left to the states any necessary regulation. The FDA attempts in this cause to establish for the first time that it is empowered to control an integral part of veterinary practice.[9] This is an unacceptable reading of the Act. Veterinarians need the freedom to prescribe and compound drugs according to the needs of its clients and not within the constraints which would be posed by the FDA's reading of the Act. Congress has *never* attempted to handcuff veterinarians in such a way and neither will this Court.

■ Having found that the agency has overstepped its regulatory authority, the Court must now fashion a remedy. We must read the regulation as consistent with the statute to the extent possible. *See Bencivenga v. Western Pennsylvania Teamsters,* 763 F.2d 574 (3d Cir.1985). The regulation is consistent with the statute to the point of exempting bulk drugs from the general labeling requirements. However, with respect to this claimant—a seller of bulk drugs to veterinarians—the limitation of the exemption (*i.e.,* that "new drugs" are not exempt) is unreasonable and arbitrary and, therefore, a nullity.

Thus, the Court finds that the exemption, of 21 C.F.R. § 201.122, from the labeling requirements, of 21 U.S.C. § 352(f)(1), does apply to exempt the bulk drugs at issue from the labeling requirements.

---

**8.** This deposition was taken in a separate but similar lawsuit pending in the District Court of New Jersey. *United States v. Algon Chemical, Inc.,* No. 87–1820 (D.N.J. filed May 12, 1987).

**9.** By affidavit, Dr. Robert M. Clack, D.V.M., stated: "If veterinarians were allowed to use only products that FDA approved and at the level that FDA approved them, it would be impossible for us to do our professional work. FDA's approved drugs and approved labeling are not flexible and do not work in the real world of animal disease." The claimant has submitted several other affidavits from veterinarians attesting similarly. While the Court must give deference to the opinion of the regulatory agency, it also gives much credence to the opinions of learned veterinarians who are physically engaged in the practice of veterinary medicine and who must cope with the day to day problems in the field, as opposed to FDA officials who are not currently engaged in such day to day, hands on activity.

### B. Applicability of Section 321(w)(3) to the Five Lots

Consistent with the previous finding, the Court holds that the new animal drug provisions of the Act, specifically here § 321(w)(3), are not applicable to the five lots of Defendant articles ampicillin trihydrate, amoxicillin trihydrate, tetracycline HCL, streptomycin sulfate, and penicillin V potassium. This is true because these are not finished dosage forms of the drugs. It is clear from the statutory scheme that Congress only intended the new drug provisions to apply to finished dosage forms.

In 21 U.S.C. § 321(w)(3), Congress defines the term new animal drug as "any drug *intended for use* in animals other than man, including any drug intended for use in animal feed but not including such animal feed ... which drug is composed wholly or partly of any kind of penicillin, streptomycin, chlortetracycline, chloramphenicol, or bacitracin, or any derivative thereof...." (emphasis added) Here, the drugs seized are not in finished dosage form and thus are not "intended for use" in animals in their present form. Thus, they are not "new animal drugs" as Congress used that term in the statute.[10] *Cf. United States v. Generix Drug Corp.*, 460 U.S. 453, 457, 103 S.Ct. 1298, 1300, 75 L.Ed.2d 198 (1983) (wherein the Court held that an entire generic drug product was subject to the new drug approval statute and not simply the active ingredient in the generic drug).

### III. Conclusion

In summary, the Court finds (1) that the bulk drug exemption of 21 C.F.R. § 201.122 applies to bulk drugs supplied to veterinarians for use within the scope of the practice of their profession, and (2) the new animal drug definition of 21 U.S.C. § 321(w)(3) does not apply to such drugs.

*Ergo*, claimant's motion for summary judgment is ALLOWED. Conversely, Plaintiff's motion for summary judgment is DENIED. In accord with this ruling, the United States Marshal is hereby ordered to return the Defendant articles to claimant.

---

10. It is interesting to note that review of the United States Code Annotated reveals that every lawsuit brought by the United States under § 321 involving new drugs or new animal drugs has involved a finished dosage drug. Clearly, the FDA is attempting to break into new areas of regulation with this as a test case.