UNITED STATES of America, Plaintiff,

v.

**BAXTER HEALTHCARE CORP., a corporation, Defendant,**

and

**Glaxo Specialties Inc., a corporation, Intervenor–Defendant.**

No. 88 C 3636.

United States District Court, N.D. Illinois, E.D.

May 16, 1989.

Anton R. Valukas, U.S. Atty., and Frederick H. Branding, Asst. U.S. Atty., Chicago, Ill., for plaintiff.

George M. Burditt and Steven M. Kowal, Burditt, Bowles, Radzius & Ruberry, Ltd., Thomas P. Sullivan and William A. VonHoene, Jr., Jenner & Block, Chicago, Ill., and Paul M. Hyman, Hyman, Phelps & McNamara, P.C., Washington, D.C., for defendants.

## MEMORANDUM OPINION [1]

BRIAN BARNETT DUFF, District Judge.

The federal Food, Drug, and Cosmetic Act, as amended, 21 U.S.C. §§ 321 et seq. (1982), has one overriding purpose: protecting the public health. See *United States v. Bacto-Unidisk*, 394 U.S. 784, 798, 89 S.Ct. 1410, 1418, 22 L.Ed.2d 726 (1969). To that end, Congress has enacted laws and the federal Food and Drug Administration ("FDA") regulations to guarantee the safety and efficacy of the drugs Americans use. By their nature, written rules are not fluid. Events and technologies can outdistance them, which lead some to argue that rules—instead of bettering the lot of citizens—become downright unhelpful. Critics level probably more of these charges

---

1. This opinion amends that issued April 26, 1989. It is effective as of the date of the original.

against the food and drug laws than they do against any other body of regulations.

In our constitutional system the courts should not be the makers of public policy. Our chief task is to apply the law as given or intended to have been given. When it comes to the Food, Drug and Cosmetic Act and its regulations, our touchstone is not what is "best" for patients or physicians, in the ultimate sense of "best," but rather what the law deems necessary to protect the public health. If a federal law or regulation enacted to protect the public health fails to serve the public's interest, it is up to the public, working through the Congress and the FDA, to change it. In the interim the sole task of the courts is to apply the law, and leave policy differences to the critics. It is better for this court to uphold the public's legislated concern for its protection from poor drugs than to risk that protection for what the court feels is best for the country.

This said, this case is a simple matter, although it requires an extensive look at the Food, Drug and Cosmetic Act and its regulations. Based on the affidavits filed to date, these are the undisputed facts: Baxter Healthcare Corporation has operat-ed two plants known as "Travenol Regional Compounding Centers" or "TRCs" since the mid–1980s. At one time, these plants manufactured as many as 35 different products containing 17 different active ingredients. Twenty of these products are antibiotic in nature, and are used to prevent infections.[2] The other 15 products were used in chemotherapy.[3]

Pursuant to two separate but similar sets of statutes and regulations,[4] the FDA has approved each of the 17 active ingredients used by Baxter as raw materials in its TRCs for use in patients under a physician's supervision. These active ingredients come in either powder or liquid form, and have FDA-approved labels that describe how they should be handled and employed. For all but three of these compounds,[5] a nurse, technician, or doctor must reconstitute the powder or dilute the liquid with an appropriate solvent prior to giving the drug to a patient. In some hospitals and clinics, this process is done in a central mixing facility. The labels of some of the FDA-approved compounds contemplate this, and describe how to prepare these compounds in bulk and store them for later use.[6]

2. Four of these products, which are marketed under the names of either Fortaz® or Zinacef®, are prepared by Baxter but owned by intervenor Glaxo Specialties, Inc. Glaxo has filed its own response to the government's present motion, but for purposes of discussion the court will refer to Baxter and Glaxo collectively as Baxter.

3. The FDA has authorized the active ingredients of five of these products, those containing the antibiotics mitomycin, doxorubicin, and bleomycin, under its special regulations for antibiotics. See below.

Baxter suspended manufacture of its chemotherapeutic products in March 1988. Baxter continues to manufacture and sell its antibiotic products.

4. The FDA scrutinizes "new drugs" under 21 U.S.C. § 355 and its regulations. The FDA approved the chemotherapy compounds used by the TRCs pursuant to the "new drug" scheme. The antibiotic compounds used by the TRCs were approved subject to 21 U.S.C. § 357 and its regulations, which provide a mechanism for screening "antibiotic drugs."

5. Fluorouracil, vincristine, and methotrexate.

6. The FDA-approved labels for these compounds list these storage requirements following their dilution or reconstitution:

| Antibiotics | Storage |
| --- | --- |
| Nafcillin | Can freeze 2 gm. standard vials up to 90 days; can refrigerate some piggyback bottle and bulk pharmacy solutions up to 14 days. |
| Ceftazidime | Can freeze some aqueous solutions in infusion vials or NaCl injections in Viaflex® containers up to six months; can refrigerate some solutions up to seven days. |
| Piperacillin | Can freeze some vial and infusion bottle solutions up to one month; can refrigerate up to one week. |
| Cefuroxime | Can freeze some solutions in Viaflex® minibags up to six months; can refrigerate up to seven days. |
| Cefamandole | Can freeze some solutions in Faxpak® containers up to six months; can refrigerate up to 96 hours. |

Superficially, the role of the TRCs in this process as anticipated by Baxter is simple: rather than have a physician or hospital solvate or dilute the compound, Baxter does it itself via the TRCs. The TRCs reconstitute or dilute the drug, and package the resulting solution in single-dosage units. Baxter then relabels and freezes the reconstituted or diluted antibiotic compounds, while only relabeling and refrigerating the reconstituted drug compounds. The new labels bear expiration dates that differ from those indicated on the labels of the original approved compounds, but Baxter has performed its own stability studies to support the new dates. With three drugs that did not require reconstitution or dilution prior to administration, Baxter would remove the compounds from their original FDA-approved containers, transfer them to larger FDA-approved Viaflex® bags, and relabel the products.[7] Baxter would then sell its single-dose "multipacks" and its pooling bags to physicians and hospitals. The administering individual would then need only obtain a pre-packaged dose or withdraw a single dose from a pooling bag, then introduce it into the patient. No reconstitution or dilution was necessary.

Because it believes that the TRCs are doing exactly what a doctor or hospital would do with FDA-approved ingredients, Baxter argues that the FDA has authorized the TRC products. The FDA argues in contrast that the TRCs are making new drugs, ones which the FDA has not approved. According to the FDA, Baxter's TRCs are violating the law, and thus the FDA has moved for a preliminary injunction halting further TRC operations. Baxter vigorously opposes the government's request for an injunction.

■■ This court's authority to restrain violations of the Food, Drug and Cosmetic Act stems from 21 U.S.C. § 332(a). In order to obtain an injunction, the government must establish that Baxter has violated the Act and that there exists "some cognizable danger of recurrent violation...." *United States v. W.T. Grant Co.*, 345 U.S. 629, 633, 73 S.Ct. 894, 898, 97 L.Ed. 1303 (1953); see also *SEC v. Holschuh*, 694 F.2d 130, 144 (7th Cir.1982) (restraining violations of Securities Act of 1933, 15 U.S.C. §§ 77a et seq. (1982)); *Commodity Futures Trading Com'n v. Hunt*, 591 F.2d 1211, 1220 (7th Cir.1979) (restraining violation of Commodity Exchange Act, 7 U.S.C. §§ 1 et seq. (1982)). The grant of authority to issue an injunction is not the same as a mandate that an injunction issue whenever the government proves a violation and cognizable danger of recurrence. The court must employ its sound discretion in imposing all equitable remedies, including those which Congress has authorized. See *W.T. Grant*, 345 U.S.

| Antibiotics | Storage |
|---|---|
| Penicillin G | Can refrigerate all solutions up to seven days. |
| Ticarcillin | Can freeze solutions up to 30 days; can refrigerate up to 14 days. |
| Mitomycin (see note 2) | Can refrigerate aqueous solution in vials up to 14 days. |
| Doxorubicin (see note 2) | Can refrigerate solution in vials up to 15 days. |
| Bleomycin (see note 2) | Can store at room temperature up to 24 hours. |
| Tobramycin | Can store at room temperature up to 24 hours. |

| Drugs | Storage |
|---|---|
| Vinblastine | Can refrigerate in vial up to 30 days. |
| Cyclophosphamide | Can refrigerate solutions made with bacteriostatic water in vial up to six days. |
| Cisplastin | Can store at room temperature up to 20 hours. |

As for fluorouracil, vincristine, and methotrexate, which are ready-to-use, doctors or hospitals will often dilute or pool these compounds, to obtain the dosage they feel is appropriate or to ease introduction of the drug into the patient. These processes too, according to the affidavits, often occur in central mixing facilities of hospitals and clinics. The labels of these compounds do not describe how such dilution or pooling should proceed.

7. The TRCs diluted vincristine and methotrexate from their original FDA-approved concentrations.

**1356**

at 633, 73 S.Ct. at 897; *Hecht Co. v. Bowles,* 321 U.S. 321, 328–30, 64 S.Ct. 587, 591–92, 88 L.Ed. 754 (1944). But Baxter intends to go ahead with its TRC program unless enjoined, and the company has not suggested other remedies for the harms which the TRC products could cause (although the FDA has not demonstrated there are any) prior to a full trial. The government's motion thus turns on whether Baxter has violated the Act, as an injunction is the only means of preventing TRC products from reaching the American market.

The FDA contends that Baxter has violated three provisions of the Act:[8] § 331(a), which prohibits "[t]he introduction ... into interstate commerce of any ... drug ... that is adulterated or misbranded;" § 331(d), which prohibits "[t]he introduction ... into interstate commerce of any article in violation of section ... 355 of this title;" and § 331(k), which prohibits

> [t]he alteration, mutilation, destruction, obliteration, or removal of the whole or any part of the labeling of, or the doing of any other act with respect to, a ... drug ..., if such act is done while such article is held for sale (whether or not the first sale) after shipment in interstate commerce and results in such article being adulterated or misbranded.

Even though the government claims three separate violations of the Act, one issue is central to the government's arguments on each: whether Baxter is making "new drugs" or unapproved antibiotic drugs at its TRCs. Unless this is the case, the TRC products are not adulterated drugs, nor has Baxter introduced them in violation of 21 U.S.C. §§ 355 and 357. Additionally, as Baxter uses or encloses the same labels on its TRC products that the FDA approved for the active components themselves, if the TRC products are the same as the active components, then Baxter has not misbranded or altered the products' labels in violation of the law.

■ Section 355 of the Act states: "No person shall introduce or deliver for introduction into interstate commerce any new drug, unless an approval of an application filed pursuant to subsection (b) or (j) of this section is effective with respect to such drug." The Act defines "new drug" as

> (1) Any drug ... the composition of which is such that such drug is not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under the conditions prescribed, recommended, or suggested in the labeling thereof ...; or

> (2) Any drug ... the composition of which is such that such drug, as a result of investigations to determine its safety and effectiveness for use under such conditions, has become so recognized, but which has not, otherwise than in such investigations, been used to a material extent or for a material time under such conditions.

21 U.S.C. § 321(p). When examining a product to determine whether it is a drug, new or otherwise, the court must look at the product as a whole, "complete with active and inactive ingredients." *United States v. Generix Drug Corp.,* 460 U.S. 453, 459, 103 S.Ct. 1298, 1301–02, 75 L.Ed. 2d 198 (1983). See also *Premo Pharmaceutical Laboratories, Inc. v. U.S.,* 629 F.2d 795, 799 (2d Cir.1980).

The government has submitted the affidavits of several experts who state that Baxter's TRC products are not generally recognized among qualified experts as safe and effective for use under the conditions recommended in their labels. The experts also claim that the TRC products have not been used to a material extent or for a material time. Baxter does not dispute these contentions. Nevertheless, rather than admit that it is making "new drugs," Baxter claims that its TRC products are exceptions to the rule, and thus it need not obtain § 355 or § 357 approval prior to marketing them.

■ Baxter claims that its products fall under at least one of three exceptions to

8. The FDA also contends that the TRCs do not employ good manufacturing procedures, a finding of which would also support an injunction. The court has set this issue aside for the present.

the Act's premarketing approval requirements. The first could be called the "repackaging" exception. In *United States v. Kaybel, Inc.,* 430 F.2d 1346 (3d Cir.1970), the government obtained a conviction against a wholesale drug distributor for violating § 355(a). The government claimed that the distributor violated the law by purchasing 500–count bottles of FDA-approved birth control pills from the pills' manufacturer, repackaging the pills in 100–count, properly labeled containers, and then selling the smaller bottles. The Third Circuit reversed the conviction based on its reading of § 355(a), reasoning that the statute required *"an* approval of *an* application" before sale of a drug in interstate commerce. Since the pills' manufacturer had received an approval of an application prior to the repackager's sales, the court held that the repackager had not violated the law. *Id.* at 1347.

Baxter's handling of all of the active ingredients except fluorouracil differs significantly from that of the repackager in *Kaybel.* If one were to look inside the 500– and 100–count bottles in *Kaybel,* one would find the exact same item: brandname birth control pills. If one were to compare the compounds approved by the FDA in this case and the TRC products, however, one would notice important differences. Many of the FDA-approved compounds are powders and liquid concentrates, while the TRC products are solvated, ready-to-use mixtures based on the FDA-approved compounds. Baxter admits that it must reconstitute or dilute each approved compound except fluorouracil before it becomes a TRC product, something which goes beyond opening one container and placing it in another. Baxter's additional manufacturing takes all of the TRC products except those containing fluorouracil out of the narrow repackaging exception set forth in *Kaybel.* See also 21 C.F.R. § 201.122 (1988) (exempting drug repackaging operations from the labeling requirements of 21 U.S.C. § 352(f)(1) unless re-packaging causes the finished article to be an unapproved new drug).

The second exception which Baxter seeks is hinted at in *Kaybel* and finds further support in the Supreme Court's dicta in *Generix Drug.* In *Kaybel,* the court stated that one would have to engage in "unwarranted distortion of the normally understood meaning" of § 355(a) to characterize the repackager's product as a "new drug," one different from the one for which the manufacturer had obtained FDA approval. See *Kaybel,* 430 F.2d at 1347. In *Generix Drug,* the Court sustained a lower court's injunction of the operations of a manufacturer of generic drugs, rejecting the manufacturer's argument that the word "drug" meant "active ingredients." The Court ruled that the Act required the courts to focus on the entire product instead. The Court noted, however, that "two demonstrably bioequivalent products, containing the same active ingredients but different excipients, might under some circumstances be the same 'drug.'" *Generix Drug,* 460 U.S. at 460–61, 103 S.Ct. at 1302.

Baxter argues that its TRC products are the bioequivalents of the products approved by the FDA. With the exceptions of fluorouracil, vincristine, and methotrexate, this is demonstrably not the case. As noted earlier, with three exceptions the FDA-approved products are either powders or liquid concentrates. None is ready for immediate patient use. By contrast, the TRC products are solutions of approved products, which are ready for patient use. These products could very well be bioequivalent to the solvated compounds prepared by physicians and hospitals from approved products, but it is untenable to argue that the FDA-approved products in their pristine form are bioequivalent to the TRC products.[9] Baxter essentially asks this court to extend the bioequivalency exception—a mere suggestion in *Generix Drug*—to cover compounds that are equivalent to products *resulting* from FDA-approved drugs. This the court will not do.

---

**9.** The only statutory use of the term "bioequivalent" comes in § 355(j). While not applicable to Baxter's present argument, see *id.* at (7)(B), the court notes that even under that definition the TRC products are not bioequivalent to the FDA-approved compounds.

■ Baxter seeks one final exception, one that if created would have indefinite boundaries. Baxter seems to argue that once someone has received approval of an application, the FDA should be deemed to have approved everything contemplated within the application. In the present context the argument goes this way: the FDA approved the 17 active ingredients, knowing that physicians and hospitals would have to manipulate them before administration to patients. Thus, the FDA sanctioned the efforts of anyone who manipulates these compounds in preparation for administration.

■ Baxter could have developed this argument further. Section 355(a) exempts products for which there is an approved application from FDA's premarketing approval requirements. Baxter might have found it worthwhile to examine the legislative history of this provision, for perhaps Congress did not think it was necessary for manufacturers in Baxter's position to file a new application for something which the FDA might have considered already. On the other hand, perhaps Baxter's failure to elaborate on these issues indicates the weakness of its argument. Congress has delegated substantial authority to the FDA, including the power to determine how the FDA is to consider an application and what that application should cover. Unless Baxter can demonstrate that the FDA's regulations covering the application process are arbitrary, capricious, or manifestly contrary to statute, this court owes the FDA's regulations deference. See *Chevron U.S.A. v. Natural Res. Def. Council*, 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984); *U.S. v. 9/1 Kg. Containers*, 854 F.2d 173, 176 (7th Cir. 1988).

Because this court owes the FDA deference in considering the FDA's application procedures, the court must reject Baxter's argument that the FDA approved the TRC operations when it approved the active ingredients used by the TRCs. Section 355(b)(1)(D) of the Act requires all applicants to provide as part of an application "a full description of the methods used in, and the facilities and controls used for, the manufacturing, processing, and packing" of the unapproved drug. The regulations which elaborate on this section require the applicant to go into even greater detail about the manufacturing process. See 21 C.F.R. § 314.50(d)(1)(ii), (e)(1)(a), (e)(2)(ii). Baxter has submitted no evidence that the applications approved by the FDA describe the TRC operations in this detail. Even if Baxter itself had received approval of each of the 17 components it uses or has used at its TRCs, it could not have changed its procedures to solvate, dilute or pool these compounds and market them in ready-to-use multipacks or pooling bags without amending its applications. See *id.* at § 314.70.

Baxter has not attacked the legality of these regulations. If it had been the company that sought and successfully received approval of the 17 active ingredients, it could not do what it has done at its TRCs. Admittedly, the FDA's regulations cover only the applicant for the drug product, but it would be illogical and contrary to the spirit of the Act for this court to permit a company that is not the applicant to do what the applicant itself could not do.

Baxter argues that a determination that it is making "new drugs" by solvating, diluting, or pooling FDA-approved compounds would require this court to find that every physician or hospital that solvates, dilutes or pools these compounds is a manufacturer of illegal drugs, unless that physician or hospital received FDA approval for every milliliter of solution prepared. This argument is attractive, but it rests on a premise that enforcement of the law is an all-or-nothing matter. It is not. The Act itself exempts physicians and pharmacists, for example, from the registration and inspection requirements of the Act. See 21 U.S.C. §§ 360(g)(1)–(2), 374(a)(2). These and other sections of the Act reflect a congressional determination, one shared by the FDA, that the most effective way to protect public health is to regulate the commercial distribution of drugs, rather than physician or pharmacist encounters with individual patients. See, for example, *id.* at § 331(a) (prohibiting introduction of

adulterated or misbranded drugs into interstate commerce); *id.* at § 331(d) (prohibiting introduction of unapproved drugs into interstate commerce).

Baxter has articulated a legitimate concern, as federal officials have been known to exploit the ever-widening definition of interstate commerce to intervene in the smaller matters of life. Nevertheless, nothing indicates that such will happen on account of the court's ruling in this case. Moreover, were the FDA to choose to regulate legally the preparation of drug doses by physicians, pharmacists, or hospitals, this court would not be the place to call for a halt to such activity. Such objections would be better directed at Congress or the agency itself.

■ This court thus concludes that the chemotherapeutic TRC products, except those containing vincristine, methotrexate, and fluorouracil, are new drugs within the definition of § 321(p), and have not received FDA approval pursuant to § 355(a). Accordingly, Baxter's sales of these chemotherapeutic TRC products violated § 331(d) of the Act. Baxter's failure to obtain approval of these products under § 355(a) also means that these products are not exempt from the labeling requirements of § 352(f)(1). This section requires labels to bear "adequate directions for use," which the FDA defines as "directions under which the layman can use a drug safely and for the purposes for which it is intended." 21 C.F.R. § 201.5. Since Baxter restricted distribution of these products to prescription use only, perforce its labels are not "adequate" for use. The FDA has regulations providing exemptions from § 352(f)(1), see, for example, 21 C.F.R. § 201.100, but Baxter has not shown that it has complied with them. As a result, these chemotherapeutic TRC products are misbranded under § 352(f)(1), and hence Baxter's sales of them violated §§ 331(a) and (k) of the Act.

Similarly, this court must conclude that Baxter has not received certification of its antibiotic TRC products pursuant to § 357 of the Act. Baxter has not received an exemption from § 357 for these products

pursuant to 21 C.F.R. § 433.1, so these products are unapproved antibiotics. They are thus misbranded under § 352(*l*) of the Act, which means that in producing and selling them Baxter violated §§ 331(a) and (k) of the Act.

This leaves the court with the chemotherapeutic TRC products containing vincristine, methotrexate, and fluorouracil. These drugs as approved by the FDA are ready-to-use, unlike the 14 other approved drugs discussed in this opinion. As noted earlier, the TRCs take small quantities of these drugs and pool them, creating larger quantities. In the process of pooling vincristine and methotrexate, Baxter diluted them from their FDA-approved concentrations. This procedure takes Baxter's vincristine and methotrexate products out of the *Kaybel* repackaging exception, as it makes the repackaged products different from the originals. As for the bioequivalency exception ⸱suggested in *Generix Drug,* Baxter does not refute the testimony of the government's experts that dilution of these drugs causes them to act differently. The court will not find bioequivalency where the unapproved compound does not have the same properties as the approved drug. Thus, since Baxter did not repackage vincristine and methotrexate along the lines of *Kaybel,* nor produced compounds which are the bioequivalents of FDA-approved drugs, Baxter's vincristine and methotrexate compounds were new drugs within the definition of § 321(p). Baxter did not receive FDA approval of these products pursuant to § 355(a), and thus its sales of them, for the reasons stated earlier, violated §§ 331(a), (d), and (k) of the Act.

■ Baxter's fluorouracil products present a different case, however. Baxter merely pooled small quantities of fluorouracil to make larger quantities, without diluting it. Baxter's fluorouracil products thus had a better chance of falling under the *Kaybel* repackaging or *Generix Drug* bioequivalency exceptions. Baxter encounters yet another problem, however, in arguing for the application of these exceptions to its fluorouracil products: its unapproved

packaging.[10] The FDA-approved labels for fluorouracil state that it is supplied in 10– and 100–ml ampules or vials. The 10–ml vials generally provide enough fluorouracil for a single dose, while the 100–ml vials come in what are called "pharmacy bulk packages."

According to the unrefuted testimony of government experts, Baxter took fluorouracil, removed it from approved vials, and pooled it in Viaflex® brand polyvinyl chloride bags for resale. The FDA-approved labels of fluorouracil do not indicate if this was proper. Moreover, the container in which a manufacturer places a drug is often as important as what is in the drug itself. The Act suggests this in various places. In § 321(p), the Act focuses the inquiry on whether something is a "new drug" on the substance's safety and effectiveness "for use under the conditions prescribed, recommended, or suggested in the labeling thereof...." Pursuant to its statutory authority, the FDA requires drug manufacturers to get approval of any parenteral (i.e., injectable) drug product "packaged in a plastic immediate container." If the applicant does not get FDA approval of the container, the FDA will consider the resulting product to be a new drug under § 321(p). See 21 C.F.R. § 310.509(a).

Baxter admits that it never received approval of its packaging of its fluorouracil products from the FDA. The FDA considers products such as these to be new drugs; § 321(p) does not clearly state to the contrary, and thus the sole question for this court is whether the FDA's interpretation of § 321(p) as put forth in 21 C.F.R. § 310.509(a) is based on a permissible construction of the Act. See *Chevron*, 467 U.S. at 842–43, 104 S.Ct. at 2781–82.

Unfortunately for Baxter, the company has not challenged the wisdom of 21 C.F.R. § 310.509(a). For several reasons this court deems it unwise to conjure its own objections to the regulation. It is undisputed from the government and Baxter's experts that the packaging of a drug can be critical to its safety and effectiveness. Containers can interact with the drug, diminishing its effectiveness or even rendering it hazardous. Moreover, the FDA-approved label directions of fluorouracil suggest that sterility of the compound is very important; the FDA should and must assure itself that Baxter's Viaflex® bags match or surpass the approved 10– and 100–ml vials in their aseptic qualities. This court thus holds that 21 C.F.R. § 310.509(a) is based on a permissible construction of § 321(p), and thus by failing to gain approval of its packaging of fluorouracil in its Viaflex® bags, Baxter introduced a new drug in violation of § 355(a). Its sales of its fluorouracil TRC products thus violated §§ 331(a), (d), and (k) of the Act.

Having found that Baxter has violated the Act, and that there is a cognizable danger of recurrent violation, this court enjoins Baxter Healthcare Corporation and Glaxo Specialties, Inc. from preparing, repackaging, or distributing the 35 TRC products listed in the government's complaint, pending trial on the merits.

---

**10.** The government contends that other TRC products suffer from similar packaging problems. As the court has found other reasons why sales of these TRC products violated the Act, the court will not wrestle with these arguments at this time.