**UNITED STATES of America, Appellant,**

v.

**ALGON CHEMICAL INC., a corporation, and Edward Latinsky, an individual.**

No. 88–5478.

United States Court of Appeals, Third Circuit.

Argued Jan. 9, 1989.

Decided July 11, 1989.

John R. Bolton, Asst. Atty. Gen., Samuel A. Alito, Jr., U.S. Atty., Kevin J. McKenna, Asst. U.S. Atty., John R. Fleder, Director, Lawrence G. McDade (argued), Asst. Director, Office of Consumer Litigation, Civil Div., U.S. Dept. of Justice, Washington, D.C., (Thomas Scarlett, Chief Counsel, Richard E. Geyer, Associate Chief Counsel, Food and Drug Administration, of counsel), Rockville, Md., for appellant.

James R. Phelps (argued), Robert A. Dormer, A. Wes Siegner, Jr., Washington, D.C., for appellees.

Before STAPLETON, and MANSMANN, Circuit Judges, and HUYETT, District Judge *.

### OPINION OF THE COURT

STAPLETON, Circuit Judge:

In this case we are asked to decide whether the Food and Drug Administration ("FDA") can enforce regulations promul-

---

* Honorable Daniel H. Huyett, 3rd, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

gated pursuant to its delegated authority under the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 301 *et seq.* ("FDCA" or the "Act"), that essentially limit the sale of new bulk pharmaceuticals exclusively to holders of "new animal drug applications." The district court held that these regulations were inconsistent with the history and purpose of the FDCA when applied, as in this case, to bulk drugs intended for sale to veterinarians solely for use in the course of their professional practices. 689 F.Supp. 394. We conclude that the FDA acted within its statutory authority in promulgating and enforcing the regulations at issue, and accordingly will reverse the judgment of the district court.

### I.

The facts in this case are uncontroverted. Algon Chemical, Inc., the appellee here, distributes drugs in bulk form to veterinarians and to others who in turn distribute to veterinarians. Bulk drugs are active ingredients intended for manufacture into finished drug products. A major customer of Algon's is Schuyler Laboratories, a company that sells bulk drugs exclusively to veterinarians. The veterinarians who purchase the bulk drugs supplied by Algon or Schuyler then compound these bulk drugs into final dosage form for administration to animals. The United States, the appellant in this case, brought this action seeking to enjoin Algon from continuing to distribute in interstate commerce 13 lots of bulk drugs which had previously been embargoed by the state of New Jersey at the Government's request, and asking for an injunction against any such future sales of similar drugs by Algon.

The FDCA, enacted in 1938 and amended in 1962 and 1968, establishes procedures for review of drug safety and efficacy by the FDA. The basic regulatory scheme of the Act, applicable to both animal and human drugs, is the requirement that "any new drug," unless it is intended solely for investigative use or is exempt under one of the Act's grandfather provisions, must be approved by the FDA before it is marketed. 21 U.S.C. § 355. A new animal drug is defined under 21 U.S.C. § 321(w) to be essentially any drug intended for use in animals that is not generally recognized as safe and effective for the uses stated in its labeling.[1]

To obtain approval from the FDA to market a new animal drug, a sponsor must file a new animal drug application ("NADA") which demonstrates by substantial evidence, consisting of adequate and well-controlled investigations by qualified experts, that the drug will be safe and effective for its labeled uses. A new animal drug not so approved is deemed unsafe and therefore adulterated under the Act. 21 U.S.C. § 351(a)(5). No veterinarian currently holds a NADA; NADAs are apparently

---

**1.** Section 321(w) provides in pertinent part:

(w) The term "new animal drug" means any drug intended for use for animals other than man, including any drug intended for use in animal feed but not including such animal feed,—

(1) the composition of which is such that such drug is not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of animal drugs, as safe and effective for use under the conditions prescribed, recommended, or suggested in the labeling thereof; except that such a drug not so recognized shall not be deemed to be a "new animal drug" if at any time prior to June 25, 1938, it was subject to the Food and Drug Act of June 30, 1906, as amended, and if at such time its labeling contained the same representations concerning the conditions of use; or

(2) the composition of which is such that such drug, as a result of investigations to determine its safety and effectiveness for use under such conditions, has become so recognized but which has not, otherwise than in such investigations, been used to a material extent or for a material time under such conditions.

21 U.S.C. § 321(w).

The Supreme Court noted in *United States v. Rutherford,* 442 U.S. 544, 549 n. 7, 99 S.Ct. 2470, 2474 n. 7, 61 L.Ed.2d 68 (1979), with respect to the same language defining "new drug" in relation to humans: "[T]he Act does not define what constitutes general recognition of a drug's safety and effectiveness under § 201(p)(1). However, based on the structure and purpose of the statutory scheme, this Court in *Weinberger v. Hynson, Westcott & Dunning, Inc.,* 412 U.S. [609], at 629–634 [93 S.Ct. 2469, 2483–86, 37 L.Ed.2d 207 (1973)], interpreted § 201(p)(1) to require an 'expert consensus' on the safety and effectiveness founded upon 'substantial evidence' as defined in § 505(d) of the Act, 21 U.S.C. § 355(d)."

held exclusively by pharmaceutical and animal feed companies which, unlike the veterinarians, have the resources to develop and test the drugs according to the rigors of the Act.

With respect to the bulk drugs at issue in this case, the FDA has approved finished drug products containing these same active ingredients. Thus, the government does not claim that the drugs in bulk form are unsafe and therefore adulterated. Rather, it maintains that the drugs are misbranded because "there are no directions for use on the labeling, and the drugs are not exempt from the requirement of adequate directions for use under provision of exempting regulations promulgated by the FDA." App. at 3.

More specifically, the government relies on a series of regulations concerning the misbranding of drugs. First, Section 502(f)(1) of the Act, 21 U.S.C. § 352(f)(1), provides that a drug is misbranded unless its labeling bears "adequate directions for use." [2] Subsequently promulgated FDA regulations have defined this provision to require adequate directions for use of the drug by *laymen* for the purposes for which it is intended. 21 C.F.R. § 201.5. In the present case, the labeling on the bulk drugs sold by Algon consisted merely of the name of the drug, the country of origin and numerical information such as the net weight of the contents, although some of the labeling also contained the following cautionary statement, "Caution: For manufacturing, processing or repacking."

Drugs need not bear "adequate directions for use" under § 352(f), however, where the Secretary has determined that such instructions are not "necessary for the protection of the public health." *See* footnote 2, *supra*. In an exercise of that authority, the FDA in 1952 promulgated a number of exemption provisions, including

the predecessor of what is now 21 C.F.R. § 201.122, which provides an exemption from the labeling requirements for the sale of bulk drugs. Yet, a proviso in the bulk drug exemption limits the exemption to drugs that are not new or that are sold to holders of approved NADAs. The pertinent portion of § 201.122 is as follows:

A drug in a bulk package, except tablets, capsules, or other dosage unit forms, intended for processing, repacking, or use in the manufacture of another drug, shall be exempt from § 502(f)(1) of the act if its label bears the statement "Caution: For manufacturing, processing, or repacking"; and, if in substantially all dosage forms in which it may be dispensed it is subject to section 503(b)(1), the statement "Caution: Federal law prohibits dispensing without a prescription".... *But the exemption shall not apply to a substance intended for a use in manufacture, processing, or repacking which causes the finished article to be a new drug, unless:*

*(a) An approved new drug application or new animal drug application covers the production and delivery of the drug substance to the application holder by persons named in the application*, and, for a new drug substance, the export of it by such persons under § 314.410 of this chapter; ...

21 C.F.R. § 201.122 (emphasis added).

On the basis of these regulations, the government argues, first, that Algon bears the burden of proving that it is exempted from the Act's labeling requirements. Second, the government maintains that the bulk drugs exemption is inapplicable because Algon has failed to demonstrate that the finished drugs to be made from the bulk drugs are not new drugs, and there-

---

2. The full text of 21 U.S.C. § 352 is as follows: "A drug or devise shall be deemed to be misbranded—
(f) Unless its labeling bears (1) adequate directions for use; and (2) such adequate warnings against use in those pathological conditions or by children where its use may be dangerous to health, or against unsafe dosage or methods or duration of administration or application, in such manner and form, as necessary for the protection of users: *Provided,* That where any requirement of clause (1) of this subsection, as applied to any drug or devise, is not necessary for the protection of the public health, the Secretary shall promulgate regulations excepting such drug or devise from such requirement."

fore the drugs are misbranded as a matter of law.[3]

In response to the government's complaint, Algon argues that the FDA is not empowered to control the manner in which veterinarians compound medicines for use solely in the course of their professional practices, that the FDA, accordingly, cannot interfere with veterinarians' access to new bulk drugs to be used in compounding and that, therefore, the FDA was required to exempt sales of new bulk drugs to veterinarians, as well as sales to holders of NADAs, from the "adequate directions for use" requirements. Algon stresses that, because the list of FDA approved animal drugs is woefully inadequate, veterinarians would be limited in their treatment options without access to bulk drugs, and the consequence of this would be the death and suffering of countless animals.

The district court dismissed the government's application for a preliminary injunction and granted Algon's motion for summary judgment. The court concluded that the proviso limiting the exemption for new bulk drugs to transactions involving a NADA was inconsistent with the purposes of the FDCA as applied to drugs sold for use in the practice of veterinary medicine. Having stricken that proviso as invalid, the court held that the drugs in question were exempt from the requirement of "adequate directions for use" by virtue of the bulk drugs exemption, 21 C.F.R. § 201.122. In reaching its conclusions, the court relied on the Act's legislative history which indicates a reluctance on the part of Congress to interfere with the "healing arts" or the state's regulation of the practice of medicine.

The court also relied on certain statutory exceptions that apply to veterinarians, declaring that: "[I]n order to apply for and become holders of new animal drug approv-

als, veterinarians would have to comply with registration and inspection provisions of the Act from which they have been expressly exempted. This is an unreasonable expectation given Congress' consistent approach of staying out of the regulation of the healing arts." App. at 189. The court further ruled that the burden could not be put on Algon to prove that the drugs would ultimately be used lawfully, because meeting that burden would be impossible. This appeal followed.

The standard of review of the district court's grant of summary judgment, involving the application of law to undisputed facts, is plenary. *Koshatka v. Philadelphia Newspapers Inc.*, 762 F.2d 329, 333 (3d Cir.1985).

## II.

The district court's decision relied extensively on, and reached the same conclusion as, the decision in *United States v. 9/1 KG. Containers, More or Less, of an Article of Drug for Veterinarian Use*, 674 F.Supp. 1344 (C.D.Ill.1987). That decision, however, was subsequently reversed by a panel of the Court of Appeals for the Seventh Circuit, in *United States v. 9/1 KG. Containers, More or Less, of an Article of Drug for Veterinarian Use*, 854 F.2d 173 (7th Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 1118, 103 L.Ed.2d 181 (1989). *Containers* is directly on point as it involved the government's successful attempt to enjoin Schuyler Laboratories—Algon's principal customer—from sales of bulk drugs to veterinarians. The Seventh Circuit Court of Appeals concluded that "[t]he effect of § 352(f) and § 201.122 is that ingredients that can be used to produce 'new' drugs may be sold only to firms that hold approved (or have filed) new animal drug applications. The FDA carefully

---

**3.** The government also sought to enjoin Algon from the marketing of certain so-called "certifiable drugs," listed by name in 21 U.S.C. § 321(w)(3), on the ground that these drugs were new animal drugs per se and thus adulterated. Although the government lost this argument in the district court below, it has withdrawn its appeal of that decision to this court because Congress has, since the filing of the

briefs in this action, deleted 21 U.S.C. § 321(w)(3). *See* Section 107(a)(1) of S. 2843, the Generic Animal Drug and Patent Term Restoration Act. The government, however, retains its position that those drugs formerly listed in 21 U.S.C. § 321(w)(3), although no longer new animal drugs per se, are nevertheless misbranded in the same respect as the other drugs marketed by Algon.

scrutinizes the activities of these manufacturers. This is a sensible result in light of the structure of the statute." *Id.* at 178.

We agree with the holding of the Court of Appeals for the Seventh Circuit. Based on our understanding of the language and purpose of the Act, as well as on the deference owed to the FDA's interpretation, we conclude that Algon cannot prevail.

### a. Statutory language

Section 502(f)(1) of the Act provides unequivocally that unless a drug's labeling bears adequate directions for use, the drug shall be deemed to be misbranded. Courts have consistently upheld the FDA's interpretation of this provision as requiring adequate directions for use of the drug by a *layman. See, e.g., United States v. An Article of Devise ... Toftness Radiation Detector,* 731 F.2d 1253 (7th Cir.), *cert. denied,* 469 U.S. 882, 105 S.Ct. 249, 83 L.Ed.2d 186 (1984). There is no question that under a lay standard the drugs presently at issue would be considered misbranded. Rather, the controversy in this case centers around the bulk drugs exemption promulgated by the FDA pursuant to its statutory authority to exempt drugs from the requirement of adequate instruction for use where that requirement is not necessary for the protection of the public health.

Again, under the plain language of the bulk drug exemption, the drugs in this case would be misbranded because, by the terms of the regulation, "the exemption shall not apply to a substance intended for a use in manufacture, processing, or repacking which causes the finished article to be a new drug ..." 21 C.F.R. § 201.122. The statutory definition of a "new drug" (*i.e.* any drug intended for use in animals that is not generally recognized as safe and effective for the uses stated in its labeling, and which is not grandfathered), does not exempt drugs that are compounded by veterinarians.

In light of the regulation's express language, Algon is forced to argue that, although a general exemption for the labeling of bulk drugs is appropriate, *that por-tion* of the regulation limiting the exemption to bulk drugs that are not new or to new bulk drugs that are intended for holders of approved NADAs, is inconsistent with the Act's purpose when applied to the sale of the drugs to medical practitioners including veterinarians. In effect, the issue posed by Algon which this court must decide is whether the FDA is required to exempt new bulk drugs intended for sale to medical practitioners from the adequate directions for use requirements when it has exempted new bulk drugs intended for sale to holders of approved NADAs.

In resolving this question, it is important to emphasize that *Congress* did not provide that bulk drugs be exempt from the labeling requirements of the Act, but rather left the decision of whether to adopt such an exemption and what form it should take to the discretion of the FDA. Indeed, the Court of Appeals for the First Circuit expressly so decided in an early case involving a challenge to the predecessor of the current bulk drugs exemption. In *Arner Co. v. United States,* 142 F.2d 730, 736 (1st Cir.), *cert. denied,* 323 U.S. 730, 65 S.Ct. 66, 89 L.Ed. 586 (1944), the court found that "[h]ad Congress intended an outright exemption of bulk shipments from the labeling requirement without restrictive terms of any sort, there would have been no need for it to provide for regulations formulating the exemption; the law would have simply stated the exemption." The court went on to reason that the bulk drugs exemption at issue in that case, which restricted the exemption to bulk shipments made pursuant to a "written agreement" containing various specifications for use of the drugs, did not represent an abuse of the FDA's authority under the Act since "[a]pplied to a situation like the case at the bar it would aid in the detection and proof of adulteration in the shipment from the manufacturer to the proprietor of the formula." *Id.* Therefore, faced with a challenge to the current bulk drugs exception, we must focus, as did the First Circuit Court of Appeals in regard to the earlier regulations, on congressional intent and the scope of the FDA's authority.

With respect to this issue, however, we are not free to evaluate the FDA's position *de novo*. Courts must show substantial deference to the construction of a statute and regulations by an agency charged with their enforcement particularly where, as here, the agency is empowered not only to construe its governing statute, but additionally to make safety judgments delegated to it by Congress; accordingly, Algon can prevail only if it can show that "the FDA's views about the need of public health are arbitrary and capricious." *Containers*, 854 F.2d at 176.

We find that the bulk drug exemption, including its limiting proviso, is not arbitrary or capricious. Indeed, it reflects a number of policy considerations that are entirely reasonable. If bulk drugs were exempt without exception from the labeling requirements of the Act, for example, manufacturers could ship unapproved drugs in bulk form and lessen the likelihood of their seizure until the drugs were produced in final dosage form; thus, the regulations facilitate detection of unapproved drug compounds. Furthermore, by restricting the distribution of these drugs to holders of approved NADAs, the regulations ensure that the drug products will be put to the safe and effective uses that warranted their FDA approval, and additionally that the drugs will be labelled properly when received by the ultimate user.

To be sure, the FDA could have provided that bulk active ingredients sold to veterinarians, like bulk active ingredients sold to holders of approved NADAs, would also be exempt from the "adequate directions for use" requirement. In fact, in 1985, after an earlier request of the Presidential Task force on Regulatory Relief to do so, the FDA reviewed its position and issued a proposal "to amend the animal drug regulations to establish criteria and procedures for approval of new animal drug applications (NADA's) for bulk new animal drug substances for use by or on the prescription of licensed veterinarians." 50 Fed. Reg. 27016 (July 1, 1985), supp. app. at 10. The proposal would enable veterinarians to compound from these bulk drugs approved finished drug products for use in their practice. If the FDA decides to adopt this proposal it would perhaps, as one consequence, effect a savings for veterinarians. *See* 50 Fed.Reg. 27016 (July 1, 1985) ("Some veterinarians and drug distributors have in the past asked FDA to permit distribution of bulk new animal drug substances to veterinarians for compounding and use in the veterinarians' practices ... The requests have been made because some veterinarians prefer not to purchase drugs in finished dosage form, which can be more expensive."). While some may consider such an amendment prudent, we cannot conclude that its absence renders the bulk drug exception as it currently stands demonstrably arbitrary or capricious.

### b. Practice-of-medicine exception

The primary argument relied upon by the district court in granting Algon's summary judgment motion was that the limiting proviso of the bulk drug exemption is not consistent with the Act as applied to veterinarians because Congress intended that the Act would not interfere with the practice of medicine. Algon relies on statements made by supporters of the Act when it was initially being considered prior to 1938 [4],

---

4. In particular, Algon cites the fact that, as a result of a concern expressed in the medical community that the first FDC Act was an attack on the prerogatives of the medical profession, the definition of the term "drug" was amended to add the words "and not to regulate the legalized practice of the healing art." S. 2800, 73rd Cong., 2d Sess. 2 (1934). Moreover, Algon relies on the debate surrounding a proposed amendment in 1935 by Senator Lewis to exclude from the term "drug" any "medicine prepared and dispensed by a physician in the course of his professional practice." 79 Cong.Rec. 5019 (daily ed. April 4, 1935). Senator Lewis was assured by Senator Copeland that "[t]here is nothing in the bill which would interfere at all with the ordinary legal practice of the profession." *Id.* We agree with Algon that this legislative history suggests that Congress did not intend to prohibit the lawful practice of medicine. Nevertheless, this history does not support the assertion that Congress intended that medical practitioners would be free to compound *any* drug substances whether or not legally available; rather, the history supports our conclusion that practitioners are entitled to prepare

and further argues that this congressional intent is manifested in two provisions adopted when the Act was overhauled in 1962 which specifically exempt medical practitioners, including veterinarians, from certain of the Acts requirements.

First, when practitioners "manufacture, prepare, propagate, compound, or process drugs or devices solely for use in the course of their professional practice," they are not subject to the registration requirement that applies to others who engage in such activities. 21 U.S.C. § 360(g)(2). Second, the FDA has no authority to inspect "records, files, papers, processes, and controls" of veterinarians and other practitioners "who manufacture, prepare, propagate, compound, or process drugs ... solely for use in the course of their professional practice." 21 U.S.C. § 374(a)(1) and (a)(2)(B). According to Algon and the district court, since Congress anticipated that practitioners would be able to compound drugs in the course of their practice, it must have intended that they would have access to the bulk drugs necessary to do the compounding.

We find this argument unpersuasive for two reasons. First, we believe that Algon misreads the congressional intent. Congress intended to authorize compounding with legally acquired drugs and not to create an exception to the Act's premarket approval process as explicated by the Supreme Court in *United States v. Rutherford*, 442 U.S. 544, 99 S.Ct. 2470, 61 L.Ed. 2d 68 (1979). Second, as a matter of fact, the record indicates that Algon's customers are not being deprived of the ability to compound drugs for their patients.

1. *Compounding with legally acquired drugs.*

We agree with the answer provided by the Court in *Containers* to the argument that Congress must have intended veterinarians to have access to bulk drugs for the purpose of compounding:

drugs that can be *legally* obtained for the purpose of medical treatment. *See* discussion in-

This conclusion depends on a suppressed assumption: that § 360(g)(2) [the statute authorizing practitioners to compound] covers *all* drugs, rather than only drugs made from components that lawfully may be obtained and compounded. There isn't any support for the assumption. The straightforward reading of this language is the one the FDA gives it: "[V]eterinarians may use in the compounding of prescriptions for their private practice whatever bulk drugs or other pharmaceuticals they may lawfully purchase." FDA Compliance Policy Guide § 7125.10 (July 13, 1976). It does not guarantee that any particular drug will be available lawfully.

\* \* \* \* \* \*

The FDA treats § 360(g)(2) as allowing veterinarians to "prepare, propagate, compound, or process drugs *from ingredients they lawfully acquire*", and the added words are no more than those implied in every statute. Schuyler does not say that § 360(g)(2) allows veterinarians to steal drugs in order to compound them, or to import drugs that are otherwise banned; no more does it allow them to obtain drugs that are otherwise mislabeled. To the extent there is any doubt, we accept the FDA's reading of its own statute.

854 F.2d at 177–178 (emphasis in original).

Thus, the medical practitioner exemptions by their terms afford no more than the right to be free from inspection and registration requirements when veterinarians and other practitioners compound medicine with legally acquired materials, not the right to acquire unapproved drug substances. Indeed, any other interpretation could not be squared with the Supreme Court's decision, and understanding of congressional intent, in *United States v. Rutherford*, 442 U.S. 544, 99 S.Ct. 2470, 61 L.Ed.2d 68 (1979).

*Rutherford* involved the question of whether the FDA could prohibit the sale and distribution of the drug Laetrile for

fra.

the treatment of terminally ill cancer patients. The Court held that, under the Act and the pre-market approval process it established, the distribution of Laetrile was prohibited for any use until its approval by the FDA. In so holding, the Court did not except from the prohibition the sale of Laetrile to medical doctors and thus clearly upheld the FDA's authority to restrict the flow of drugs to or by medical practitioners. We perceive no difference between the government's actions is this case and those in *Rutherford;* here, as in *Rutherford,* the government is merely enforcing its right under the Act to control the supply of unapproved drugs in interstate commerce.

Algon seeks to distinguish *Rutherford* in two ways. First, it argues that the Court did not have occasion to address the practice of medicine exception in that case, and therefore did not resolve the issue before this court. Second, it maintains that the case involved FDA control of the distribution of drugs *unapproved in any form,* so-called "huckstered" products; with respect to the drugs at issue here, unlike with laetrile, the FDA has approved finished drug products containing these same active ingredients.

These distinctions are not meaningful. Although the Court did not explicitly address the practice of medicine exception, its holding necessarily places limitations on a physician's unfettered practice of medicine by interpreting the Act as intending a pre-market approval process applicable to all drugs, whether sold over the counter or by prescription. At the very least, *Rutherford* stands for the proposition that the FDA can regulate which drugs will be made available on the market. *See United States v. Evers,* 643 F.2d 1043, 1048 (5th Cir.1981) (emphasis in original) ("Of course, while the Act was not intended to regulate the *practice of medicine,* it was obviously intended to control the *availability of drugs* for prescribing by physicians.").

Moreover, as the government stresses, when the FDA grants approval it is not merely of a drug *substance,* but additionally represents approval of a safe process of manufacture. This process involves consideration of such issues as where the raw materials come from, which inactive ingredients are going to be added and in what measure, how the drug will be packaged and how shelf-life will be maintained. Thus, insofar as the veterinarians in this case are not seeking to use finished-form drugs, the FDA's exercise of authority here—attempting to regulate an unapproved drug offered for distribution in interstate commerce—is the same as its exercise of authority upheld by the Court in *Rutherford.*

Algon further argues, however, that limiting drugs that veterinarians can compound to those lawfully obtainable means for all practical purposes that veterinarians will be unable to compound. This is so because first, according to Algon there are no drugs useful to the practice of veterinarian medicine that are "not new" or "grandfathered," thus neither of these exceptions to the Act's coverage would afford veterinarians the ability to compound. Second, and more important, Algon explains that under the FDA's so-called "extra-label use" policy, veterinarians cannot even put finished-form medications to uses other than those approved by the FDA. Thus, Algon argues that Congress must have intended that veterinarians receive the bulk drugs needed for compounding, otherwise its affirmation and protection of their right to compound would be meaningless.

When analyzing this argument we must be mindful that our function is not to determine whether the FDA's current regulation provides for an adequate supply of drugs to veterinarians. Rather the issue here is one of congressional intent. The appropriate focus for discerning this intent is the time frame when Congress enacted the registration and inspection exemptions for medical practitioners, specifically, 1962. At that time, "not new" and "grandfathered" drugs were available for the use of most medical practitioners. Moreover, at that time, as Algon acknowledges in its brief, all medical practitioners, including veterinarians, were permitted to put approved drugs to uses other than those specified on the label. The history of the

FDA's extra-label use policy with respect to veterinarians in particular was reviewed in the 1985 testimony of a former director of the FDA's Center for Veterinarian Medicine:

In reviewing the situation in 1983 and 1984 when we implemented the extra-label drug use policy, Mr. Chairman, what we did was tighten down considerably, as you perhaps know. Prior to that time, the policy of the Food and Drug Administration for veterinarians was, and I quote:

"Veterinarians may use any drug they may legally obtain in their practices in accordance with their professional judgment and as long as they did not cause illegal residues."

When we changed the policy, we tightened down on that considerably. We said no longer could veterinarians have impunity to use any drug they could legally obtain. They could use only those drugs that were approved in at least one species, and only in emergency circumstances could they deviate from label directions, and then only in a veterinarian/client/patient relationship.

It was a considerable tightening of our policy.

Now, the ultimate tightening, as you mentioned earlier in your communication with Mr. Drozen, is to forbid any uses other than what is on the label. That would be the ultimate.

*The Regulation of Animal Drugs by the Food and Drug Administration: Hearings Before the Subcomm. on Intergovernmental Relations and Human Resources of the House Comm. on Government Operations,* 99th Cong., 1st Sess. 263 (1985) (statement of Lester M. Crawford, Director, Center for Veterinary Medicine, Food and Drug Administration). *See also* Compliance Policy Guide 7125.06, "Extra–Label Use of New Animal Drugs in Food–Producing Animals" (Nov. 1, 1986).

On the basis of the FDA's liberal extra-label use policy prior to the 1980s, veterinarians as well as other medical practitioners were free to use finished-form drugs for the purpose of compounding in the course of their practices. Thus, when Congress enacted the exemptions for the compounding of materials in the course of professional practice, it need not have intended that unapproved bulk drug materials be obtainable for such purpose because practitioners had the ability at that time to further compound, or make extra-label use of, finished-form drug products. We conclude, therefore, that the legislative history suggests that Congress intended to afford practitioners nothing more than the right to compound drugs which could be legally obtained.

Our reasoning is further supported by the very cases relied on by Algon for the purpose of establishing judicial recognition of the practice of medicine exception. In *United States v. Evers,* 643 F.2d 1043 (5th Cir.1981), the Court of Appeals for the Fifth Circuit was faced with the issue of whether a doctor who prescribed an approved drug for an unorthodox use violated the misbranding provisions of the act. Although the court of appeals ultimately did not reach the issue found dispositive by the district court—specifically, that under the practice of medicine exception of the Act a licensed physician has the right to prescribe any lawful drug for any purpose—its reason for not deciding the issue was because

the FDA has at no point contended, and the government does not argue on appeal, that the misbranding provisions of the Act prohibit a doctor from prescribing a *lawful* drug for the purpose for which the drug has not been approved by the FDA. To the contrary, ... [when the Doctor requested permission for such use, the FDA] responded by letter that *"[u]se of a locally obtained drug for an indication which is not in the package insert is considered 'the practice of medicine' "* and that [the Doctor] therefore need not seek any exception to the regulations.

*Id.* at 1048 (emphasis added). Thus, the Court of Appeals for the Fifth Circuit, although acknowledging the existence of the practice of medicine exception, nevertheless characterized it in effect as the extra-label use of a lawfully acquired drug.

The Court of Appeals for the D.C. Circuit's discussion of the practice of medicine exception in *Chaney v. Heckler*, 718 F.2d 1174 (D.C.Cir.1983), *rev'd on other grounds*, 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985) is even more supportive of our understanding of the medical practitioner exemptions. *Chaney* involved the issue of whether the FDA must approve drugs intended for use in lethal injections before these drugs could be put to such uses. In the course of its decision, the court explicitly acknowledged and explained the "practice of medicine" exception as follows:

> The better explanation for the practice-of-medicine exemption is that Congress did not want to interfere with physicians' treatment of their patients. *New uses for drugs are often discovered after FDA approves the package inserts that explain a drug's approved uses.* Congress would have created havoc in the practice of medicine had it required physicians to follow the expensive and time-consuming procedure of obtaining FDA approval before putting drugs to new uses. Thus, Congress exempted the practice of medicine from the Act so as not to limit a physician's ability to treat his patients.

*Id.* at 1180 (emphasis added). This description of congressional intent fully supports our view that Congress intended no more than to preserve medical practitioners' right to compound medicines *legally* obtained in the course of their professional practice. As the Supreme Court made clear in *Rutherford*, Congress left the determination of what drugs shall be made available on the market to the expertise of the FDA.

Finally, we believe that the enactment of the medical practitioner exemptions not only fails to support Algon's position, but additionally supports an inference that cuts against it. These exemptions indicate that when Congress intended to exempt medical practitioners it knew how to do so. Congress could have, for example, made clear that bulk drugs sold to medical practitioners were exempt from the Act's coverage, but there is no such blanket provision in the Act.[5]

In sum, on the basis of this legislative history we cannot conclude that Congress intended that bulk drugs purchased by veterinarians for compounding in the course of their professional practices be excluded from the Act's labeling requirements and, accordingly, that the FDA's limitation of the bulk drugs exception to holders of approved NADAs is inconsistent with the Act's purpose.

2. *No material restriction on the practice of medicine.*

As a second response to Algon's position that the bulk drug exemption as promulgated impermissibly intrudes on the practice of medicine in violation of the intent of Congress, we find that Algon has failed to demonstrate on this record that the FDA's action here interferes with the practice of medicine. Although the government's action denies veterinarians' access to bulk drugs, it does not affect veterinarians' ability to purchase these drugs in final-form medication. In other words, to the extent that veterinarians need drugs that have

---

**5.** We note that this same reasoning also undermines Algon's reliance on the Virus–Serum–Toxin Act, 21 U.S.C. §§ 151–158 ("VSTA"). The VSTA is a separate act of Congress enacted in 1913 and amended in 1985, which governs the regulation of "biologic" drugs, including serums, vaccines, toxins or antitoxins that are intended for use in the treatment of domestic animals; in general, biologic drugs are the product of biologic origin as opposed to drugs that are chemicals. Algon relies on VSTA's 1985 amendment which exempts from the requirement for premarket approval biologic drugs that are prepared "solely for administration to animals under a veterinarian-client-patient rela-

tionship in the course of the State licensed professional practice of veterinary medicine...." 21 U.S.C. § 154a(2). According to Algon, by amending VSTA as such, Congress intended that both VSTA and the FDCA be interpreted the same with respect to the general exemption for the practice of medicine. We are not convinced. Indeed, we agree with the government that to the extent that reference to VSTA is probative at all, it hurts rather than helps Algon's position; VSTA's language suggests that when Congress has chosen to exempt drugs prepared by practitioners from certain statutory requirements, it has done so explicitly.

been approved as active ingredients by the FDA so as to make new drug compounds that have not been so approved, their access to these products for treatment purposes is not meaningfully limited by curtailing the sale of bulk drugs to them. The veterinarians can buy the approved finished drug product containing the requisite active ingredient and use that to compound their medicines.

In none of the affidavits submitted by Algon to the district court for purposes of summary judgment was it suggested that bulk drugs in particular were *necessary* for the practice of veterinarian medicine, as opposed to merely *preferred* as the cheaper and simpler alternative to compounding with finished-form drugs. Indeed, the veterinarians consistently averred that they used bulk drugs as well as finished-form drugs in their compounding. *See, e.g.,* Crouch Statement, app. at 69 ("Since leaving school, I have continued to compound medicines as part of my licensed practice. To do this, I use bulk drugs or finished dosage forms of pharmaceuticals."); Clack Statement, app. at 75, 77 ("The products that we use to compound medicines are pure bulk drugs and finished dosage forms of pharmaceuticals.... The pure form of bulk drug is much more suitable for compounding, generally, than the FDA-approved products, which contain carriers and other ingredients that make drug delivery difficult. When pure form of bulk drug is used, compounding is a relatively simple operation."); Skiles Statement, app. at 86–87 ("It is easier to compound with pure bulk drugs than with finished dosage forms, which have carriers and stabilizers that can make the process complex. Using finished forms for compounding is much more expensive than using bulk forms; the cost of the finished dosage forms would be prohibitive for the economically distressed feedlot owners, and offer no medical advantage at all."); Westlake Statement, app. at 92 ("The use of bulk drugs is more economical and provides greater flexibility to the prescribing veterinarian."). Thus, insofar as the FDA's limitation on the bulk drugs exemption affects only the *form* in which the drugs will come in, it does not impair the ability of veterinarians to compound the drugs they deem desirable for their patients.

To be sure, the extra-label use of drugs in the context of the veterinarian practice, as we earlier noted, has tightened in recent years from essentially freely allowing such use to stricter enforcement of no extra-label use even by veterinarians in the course of their professional practices. *See The Regulation of Animal Drugs by the Food and Drug Administration: Hearings Before the Subcomm. on Intergovernmental Relations and Human Resources of the House Comm. on Government Operations,* 99th Cong., 1st Sess. 263 (1985) (statement of Lester M. Crawford, Director, Center for Veterinary Medicine, Food and Drug Administration); Compliance Policy Guide 7125.06, "Extra–Label Use of New Animal Drugs in Food–Producing Animals" (Nov. 1, 1986). Nevertheless, whether the FDA's extra-label use policy interferes with the practice of medicine is not properly at issue in this case. The issue of whether the FDA can control the supply of *bulk* ingredients does not implicate the question of whether it can control the *use* of these ingredients in finished-form products in the sense that practitioners can continue to compound—and face the same potential liability as before—even if the FDA restricts their access to bulk materials.

The only real objection to the government's actions in this case appears to be an economic one: Algon complains that "it makes no sense to use finished drugs to compound medications because the finished drug contains unnecessary ingredients, and quality pure bulk drugs are available." Brief at 12. Although finished drugs which contain unnecessary ingredients may cost more, and may even in some respects be more difficult to use, there is no evidence in the record that such an increase in cost would result in a material limitation on the treatment options available at present. Thus, the FDA's action effecting an increase in cost of drugs to practitioners does

not undermine the practice of medicine or treatment decisions of veterinarians.[6]

### III.

For the foregoing reasons, the judgment of the district court will be reversed and the case will be remanded for further proceedings consistent with this opinion.

---

6. Although in an amicus curiae brief submitted after oral argument in this case, veterinarians Cliff Skiles and Robert Clack suggest a greater impact on their practices if their access to bulk drugs is restricted than they had previously described in their affidavits of record, we, of course, are confined to considering those facts reflected in the record before the district court.